1794 N. Ray Media Queue. I might have just two minutes, Your Honor, to run through it. Sure, sure. Thank you. Thank you, Your Honor. Thank you, Your Honor. Your Honors, the main claims being appealed from here are 13 and 23, and I want to talk about three or four different things in this appeal, which I think are the most critical points. Number one is the issue of analogous art. Number two is if the court finds that either the Elston reference or the Batt reference are non-analogous art, then a lot of the claims we're going to talk about fall away there. If the court believes that Elston and Batt are analogous art, we have to go to the next phase, which is to look at whether in combination they meet the claim language, and things like that, whether the declaration was properly considered, and that kind of thing. The written description I will leave for the end. The main problem we have with this appeal, Your Honor, is again this issue of a moving target. In the original underlying examination, we had statements from the examiner about what he was considering to be analogous art. Can you just clarify something? Certainly. Netflix was part of this originally. Netflix was the party that brought… Yes, Your Honor. Is there anything that you can tell us about that? I will give you the best that I can. I was not involved in any of the litigation per se, but Netflix is the entity which brought the original underlying inter-parties re-examination request, yes. Right. No, it's not. That wasn't the mystery. Why are they not here? Tell me if that's… That is not something I can kind of bite around. I'm not sure why it was that they just decided to bow, but they stopped participating very early in the process. Okay. Okay. I can't speak to that, unfortunately. The main issue we have here with this examination, again, is this constant moving target. In the original underlying examination, and I apologize, on page 17 of the brief as submitted, there is a typo, 1, 2, 3. The fourth line from the bottom is a citation to A5610. That should actually be 1769, and that's an error on my part, which I apologize. In that part of the discussion, the examiner said, I'm including all these references as being analogous prior art because they are user notification and inventory management and they fall within the scope of the invention. We pointed out to the examiner that whether or not a reference fell within the scope of the claim was not the appropriate test, and therefore, we needed to come up with a better explanation. Sometime thereafter, the examiner changed the test to say, well, in the right of appeal notice, he says, what I'm really talking about is that it is now user notification and replenishment. That appears in the examiner answer. Now, what we have is we've been arguing this case for several years, trying to figure out what's analogous art, and now the examiner changes the definition. He says, no, it's really this field. That's what we, again, argued on appeal, that's what was briefed. The board, again, in the decision, changes the definition of analogous art, and you can find this on pages 89 and 80 of the appendix, in which they say, well, the real prior art is something which determines if the subscriber's inventory is empty. Within that same document, on appendix page 22, they change it yet again, and say, no, it's actually maintaining a customer account. Your Honor, I just feel that this has really handicapped us significantly because throughout this prosecution, we haven't been able to have a single target to focus on and attack. I think that that has really deprived us of due process. But the key point is that the board here completely ignored the examiner's test, and they did it for one simple reason. The examiner knew that the moment he started casting a blanket of what's analogous art to try to cover these references, it wasn't going to work. If you try to make a cover of one reference, it was not going to cover something else, and vice versa. If you pull them one direction, suddenly this reference would become prior art. And Your Honor, I just think that's a form of gamesmanship which should not be allowed. Are you still arguing claims 39 and 40? Yes, Your Honor, I believe those deal with the written description requirements. And those are, I can talk about them now if you like, Your Honor, but those deal mostly about secondary issues. But the main point there is that for claim 39, the figures show that a lot of the logic and structures can exist either in the cloud, on a server someplace else, or can be put into a device in the home. And what we said was, well, if these structures live in the home, then the thing which is supposed to be looking at and monitoring was also going to be there as well. That was for claim 39 anyway. I know that figures are part of the specification, but you keep talking about figures and not what's written in the specification. Is there support for what claims 39 and 40 recite? Yes, Your Honor. And I believe we pointed out in the main brief, which I will move to here. On page 57 of the brief, we pulled out figure 7 as well as the accompanying text that went with that figure and said, disclosure tells you that this thing, which is called a subscriber delivery queue, and I pointed it there with a circle in the middle, can exist as well on this receiver S5. And therefore, all the attendant logic, which is looking at, is supposed to be monitoring this thing, would be understood by a person skilled in the art to also be living at home, if you will, pardon the pun, on that receiver. And therefore, we felt that it was fairly clear that those things would travel with it. That was the main support for that claim, Your Honor. For claim 40… Maybe the problem you're having in the Department of Justice is you don't answer the question, because I asked you where in the specification is the support for claims 39 and 40. Okay, Your Honor, I'm sorry. Figure 7 is in the specification. In the appeal brief, I believe we pointed out to the column 17, 1 to 2 in the specification, and column 25, 35 to 52, was the text that we were borrowing from the disclosure.  In any event, I just want to talk about the pivotal issues for us, really, on this issue of analogous art. The board didn't even really try to go through the exercise of trying to figure out what it was analogous art. They just simply, again, just said, here's what it is. We pointed out that they were disconnecting it completely from the specification, they were making it up, they didn't look at the specification, what the specification said was the purpose of the invention. In terms of the rejections themselves, for claim 13, the main rejection was based upon Hastings plus this reference called Bott. I believe, Your Honor, looks at the original rejections as formulated by the original examiner, and they appear in the appendix at A729, and I'm not going to go through them in detail, but I'll simply say, it consists of a lot of this kind of discussion, it consists of comments like, Hastings is missing X, but Bott teaches Y, a person skilled in the art could have put them together, that result would have been predictable. Oh, and the motivation to combine them would be that once you've combined them, you've got both things. Your Honor, I just feel that that's just circular logic, that is a formulation this Court has to say, that because you have two things and could put them together, and can manufacture an excuse to put them together, that somehow that's obvious to combine. Throughout this rejection, which appears in the appendix A729 and onwards, it's the same kind of formula, Hastings is missing all these elements, every single instance, something is borrowed from someplace else to try to fill in the gaps, and every single comment is exactly the same formula. Because of this comment, that somehow a person looking at these things could have picked out these two things and put them together, and it would have been predictable, that was the reason why we submitted the declaration. The declaration basically said, well it may seem at first glance that it would be obvious to pick these two things, there's reasons why it's not, and here's the reasons why. That declaration was not considered for reasons which we explain in the brief. We believe that that in itself also is a significant legal error. The examiner basically said, because you didn't prove the defendant in this case infringes these claims, you can't prove Nexus under any theory whatsoever. We pointed out to the Board that that is not an appropriate test. The Board has to have a consistent test for interpreting the claims. If you're going to interpret the claims broadly for purposes of analyzing the prior art, you should have given us the same benefit when you looked at my Nexus and my declaration about whether or not the infringing equipment fell in the scope of the claims. Instead, they very clearly said, no, we're looking at the district court opinion, which said there's no infringement, therefore there can't be a Nexus, end of story. That was the main point we raised about the declaration of honor. I think it's a new point which I've not seen before in any of your jurisprudence, at least in my experience. So, for the prior art references, we pointed out why, in most instances, the combinations simply were being combined based upon this arbitrary formulaic logic without any kind of thought process. We also pointed out that the references themselves, again, were very tangential. This reference cited against Claim 13, for example, had to do with people who were subscribing to a publishing system. So, if you wanted to find out information about what's going on in sports or whatever, you could subscribe to this system and it would give you sports information. There was one tiny mention of, well, maybe stores could publish inventory information there somewhere and you could find out if a store had inventory or not. What we pointed out was, Your Honor, was that, okay, fine, even accepting for what that is, that's saying nothing whatsoever about keeping track of individual people's accounts and giving them specific information about their account. That's like saying, I'm a customer of Macy's, does Macy's have this particular dress or not? That's fine, that's one thing. It's not telling me whether my account at Macy's is overdue or I've got a new dress to go pick up at Macy's because it's good for me. We simply pointed out that even when you added the pieces together, you weren't getting the result that was attended to the claim. The same thing happened with Claim 43 in that, again, within the appendix, you will see kind of a moving target again. The original rejection was based upon one grounds. It changed. But again, fundamentally, the main reference that was cited was this Elston reference and if Your Honors look at the Elston reference for what it is, again, it has nothing really to do with this field of art and we submitted that a person looking to improve an online rental subscription queue system would have almost no interest in a reference like this whatsoever and that when you add it together again, you have the same problem. What it's really telling is that the examiner, when he cited Elston originally, said, well, this is a system which is, and I'll quote again. This system deals with inventory management and we said, well, where's the inventory management going on in this reference? How can you cite this reference? That's why magically in the appeal brief, I'm sorry, he said, no, it's really replenishment. We attack that. That is why the board changed the test and completely diluted it and transformed Elston into a reference when it wasn't before. Okay. Or is it my time? Dave, can you start us off? Your Honor, may it please the Court? This inter-parties re-examination, the appeal involves nine different prior art references, but not all of those references were created equally. From the beginning of this re-examination, one reference, Hastings, has been used principally to disclose 99% of the disputed limitations. Hastings describes an internet-based movie rental system. Hastings expressly discloses having the customer provide selection criteria and then having the internet-based movie provider automatically satisfy those criteria. For example, Hastings describes selecting movies based on the director or actors, etc. Hastings also expressly discloses allowing the customer to set priorities. So for example, if the customer wants a new movie when it comes out, when that movie does come out, it jumps ahead in the queue. And finally, the Hastings reference expressly discloses a max-out feature that controls the action of the movie rental system based on a certain quantity of movies being reached, a certain quantity of movies held by the customer. From the beginning of this examination, the examiner found that, relied principally and heavily on Hastings, he found, for example, and I'll quote, that when interpreted broadly, Hastings could read on the queue replenishment control rules as recited in claims 1 and 13. Throughout this re-examination and this appeal, appellant has never challenged either the examiner or the board's findings regarding the scope and content of Hastings. The board went on to repeat the examiner's findings and also find that Hastings alone is sufficient to satisfy at least the disputed limitations of claims 1, 13, 23, 99, and 103. The board and the examiner did rely on an additional reference, Steele, to disclose the limitations of claims 1, 10, and 1, 11. Mr. Mattel, is it correct that claims 39 and 40 were not rejected as obvious? They were not, for lack of written description. And I'm wondering why that is a proper rejection. Claim 39, relating to activity being performed in the home, seems to be supported. Tell me if it's not. Column 25, lines 36 to 40. And claim 40, relating to third party, as a third party location, why it isn't set, disclosed, and picked. Column 24, lines 44, that's it. Addressing those two in order, so with regard to whether there's written support for conducting the queue monitoring from the home, the passage you cited, Your Honor, from column 25 relates to figure 7, which is at page 82291 of the record. The court prefers to refer to that page. And the cited passage at page 25 does refer to certain functions, in the words of the specification, may be located physically on a home receiver, player owned by the subscriber. But the things that are described as being on that home receiver are the subscriber selection queue and the titles out queue, and those relate to renting, but they're not the function of monitoring and executing the selections. That passage does also state that several other hardware and software modules of figure 7 may be located on the home receiver, but it never specifies which of those are. And again, all of this relates to figure 7. The function that is disputed as to whether it's described as being executed on the home monitor, which is in the center of the bottom item 726 in figure 7, figure 7 clearly distinguishes between client devices at the top and service provided by the server at the bottom. That queue control monitor is among the items that are described as service provided by the server, not on the home system. And again, there is this ambiguous passage on column 25 that says some of these functions could be on the home system, but there's no express indication or implicit indication that this monitoring function is one of those functions that could be executed on the home server. What about claim 40? Claim 40? Column 24. I'll concede, Your Honor, that that passage does appear to provide support for third party monitoring. The difficulty with appellants reliant on that passage is the first brief that ever provided that passage and brought it to this court's attention was the solicitor's brief in this case. But it's there. It is there, Your Honor. There's no objection. It's a lack of written description report, and it's there. It was never pointed out to the examiner or the board. In the solicitor's view of this case, our office came across this passage and felt it deserved to be brought to the court's attention. However, for purposes of this appeal, appellant has waived any argument with regard to that passage. It's never been examined, and it's frankly unclear whether that passage would necessarily meet all of the limitations of claim 40. So a claim is invalidated because of poor advocacy? Yes, Your Honor. This court and the board have clear rules on waiver. If an applicant believes that a particular passage provides written description support, it's his obligation to point it out, and when it's not pointed out, it can't be raised for the first time in a reply brief. With regard to the other objections, I'd be pleased to answer any questions the court has about the Juan, Elston, Bott, Shufri, Shavo, Scher, or Steele references. But unless any questions are offered, I'm prepared to yield my time. Thank you. Your Honors, I just have one or two basic points to make, and the first one is that I appreciate the position of the solicitor's office. They come into this very late in the game. They did not participate in the process before, and therefore, I understand why some of the comments are a little bit tangential. For example, this question about Hastings disclosing all the limitations of the claim, that is just completely wrong. I don't think he said that. I think he said predominantly. Well, I think the words he said were 99%. 99%. That's a pretty big number, Your Honor. I'm sorry. But I think if Your Honor will look with me at the appendix at page A-79, this is the original rejection by the examiner, and if you follow along in those pages, you'll see limitation by limitation. He starts off with Hastings on A-729. The moment he gets to the very next limitation, defining a set of notification rules by the subscriber, he says, as disclosed by Bott, he's not relying on Hastings anymore. We go over to the next page, page 731, which talks about monitoring with a bunch of replenishment rules. The very first words out of his mouth are, page 731, Bott thus discloses, and so on and so on. And as I said, Your Honor, the logic throughout the entire discussion is always the same. It's always, well, a person looking at your references could have picked that piece, and he could have picked that piece, and he could have put them together, and so on. And Your Honor, I just don't feel that that's an acceptable test that you folks have adopted or embraced before. I would say that the issue with these cases, the examination cases, is that unfortunately over time, things do get muddled and blended, and that's why as time goes on, the points tend to get focused, and therefore, we don't tend to drag along with us every single point again. So again, I understand why the solicitor's office may have believed that there was so much in Hastings, because this discussion doesn't get pulled along all the way along to the appeal brief. But fundamentally, there were big issues with Hastings, and that's why the references were cited by the requester. And I might add, the requester had a very significant opportunity incentive, obviously, to find the best references in this case. And with that, I'm done. Thank you. We thank all counsel and the case was submitted.